The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chrystal Redding Stanback and the briefs and oral arguments on appeal. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission affirms and adopts the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at hearing on 29 November 1999 and in a Pre-Trial Order as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the employment of plaintiff in this action was and is subject to the jurisdiction of the Industrial Commission of North Carolina pursuant to the Worker's Compensation Act.
2. Perdue Farms, Inc. was and is a qualified self-insured employer under the Act at all times relevant to this claim.
3. Crawford Co., Inc. was and is the servicing agent for Perdue Farms, Inc. at all times relevant to this claim.
4. At the hearing on 29 November 1999, Plaintiff's medical records were stipulated into evidence and marked as Stipulated Exhibit #1.
 ***********
Based upon the entire evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing on 29 November 1999, plaintiff was a 54 year-old female and had completed the eighth grade. Plaintiff began working at defendant's Lewiston, North Carolina facility in 1975 and worked through 4 June 1996, when she voluntarily left her employment.
2. Plaintiff was diagnosed with, and had surgery for bilateral carpal tunnel syndrome in 1991 and 1992. These claims were accepted by defendant as compensable and the parties entered into a clincher agreement regarding those claims, which are not at issue in this case.
3. Following her carpal tunnel surgery, plaintiff was placed in a job in the giblet packing department. In this job, plaintiff worked on the wrapping machine placing livers, gizzards, hearts and necks into a machine. This job is accurately portrayed in the stipulated job videotape entered into evidence with the exception that taking wrap off the wrapping machine is not depicted. Plaintiff also rotated into a job scooping livers and gizzards. In that job, plaintiff used a hand-held scoop to move the product from a holding tank into plastic bags. Plaintiff performed this job while standing and was using her arms at waist level. The jobs performed by plaintiff were all regularly available jobs within the plant and were part of the production process.
4. Plaintiff's carpal tunnel syndrome was last treated by Dr. Josephus Bloem, an orthopedic surgeon, who performed a left carpal tunnel release in June 1991 and a trigger thumb release in January 1992. In July 1992, Dr. Bloem assigned a ten percent (10%) permanent partial disability rating to plaintiff's left arm and a six percent (6%) permanent partial disability rating to her right arm. Dr. Bloem did not treat plaintiff after May 1992. At that time, he released plaintiff to return to the giblet packing job.
5. On 11 April 1995, plaintiff was evaluated by Dr. Melvin Clayton, an internist, for complaints of right hip and right shoulder pain. Dr. Clayton diagnosed plaintiff with osteoarthritis and referred her to a rheumatologist for evaluation. Dr. Clayton makes no reference as to the cause of plaintiff's condition and his records do not in any way relate it to plaintiff's work.
6. Based on Dr. Clayton's referral, plaintiff was seen by Dr. Michael Ramsdell, a rheumatologist. Dr. Ramsdell first examined plaintiff on 27 April 1995, at which time plaintiff related a history of right shoulder bursitis for several years, as well as right hip pain and a carpal tunnel release. Dr. Ramsdell's examination revealed good range of motion of the shoulders and was otherwise normal. His impressions listed an unknown right-sided illness, diabetes for ten years, obesity, estrogen use, and a carpal tunnel release. Dr. Ramsdell ordered some blood tests, referred plaintiff for an evaluation of her circulatory system, and allowed her to continue to work.
7. Dr. Ramsdell last saw plaintiff on 1 June 1995. He discussed Dr. Powell's findings concerning the hip pain. He also diagnosed right shoulder bursitis, but did not inject plaintiff's shoulder with cortisone because of plaintiff's diabetes. Dr. Ramsdell does not offer any statement of causation concerning the bursitis, nor does he relate it in any way to plaintiff's work.
8. Plaintiff was next evaluated by Dr. Robert Hansen, a neurologist, on 14 July 1995. Dr. Hansen evaluated plaintiff for complaints of hip and thigh pain as well as right shoulder and arm pain. Dr. Hansen noted plaintiff's job operating a wrapping machine, where she loads gizzards, livers and hearts into a machine. Dr. Hansen's examination revealed normal extremity strength, but tenderness across the shoulder and in the legs. Dr. Hansen found limited range of motion in the right shoulder and decreased sensation in the extremities. He diagnosed myofascial pain syndrome, diabetic neuropathy, a frozen shoulder, and possible Reynaud's phenomenon. Dr. Hansen recommended physical therapy and anti-inflammatories and continued plaintiff in the giblet packing job without modification.
9. Plaintiff was re-evaluated by Dr. Winfred Bragg, a partner of Dr. Hansen's, on 7 September 1995. This examination focused on plaintiff's right shoulder and right hand. The examination revealed decreased range of motion and tenderness, but a normal motor examination. Dr. Bragg diagnosed right shoulder tendonitis and Reynaud's phenomenon and continued the medications and physical therapy. Dr. Bragg continued plaintiff in her regular job, but told her not to immerse her hands in direct cold for two weeks with respect to her possible Reynaud's phenomenon.
10. Plaintiff returned to Dr. Bragg on 28 September 1995. An examination of her right shoulder on that date revealed a full range of motion with some pain, but a normal motor examination. Dr. Bragg continued plaintiff on therapy and medications. Plaintiff's finger numbness had diminished as a result of the restrictions on contact with cold so those restrictions were continued. Plaintiff again returned to Dr. Bragg on 12 October 1995. At that examination Dr. Bragg diagnosed myofascial pain syndrome, right shoulder tendinitis, and bilateral carpal tunnel syndrome. Dr. Bragg ordered electrodiagnostic studies for plaintiff's hands and therapy for her shoulder; she did not alter plaintiff's job duties.
11. Plaintiff did not receive additional treatment for her shoulder until she returned to Dr. Doss on 11 April 1996. At this examination, plaintiff complained of pain all over her body, including her right shoulder, both legs, and her back. Dr. Doss diagnosed myofascial pain syndrome, right shoulder pain, and low back pain. Dr. Doss kept plaintiff on the giblet packing job and ordered an MRI of the lumbar spine and a rheumatoid profile. Dr. Doss also found that her diabetes was not under control and that she needed to better control it.
12. On 16 May 1996, plaintiff again saw Dr. Hansen for complaints of pain in her shoulders, wrists, and legs. Dr. Hansen diagnosed a myofascial pain syndrome as the cause of her shoulder discomfort. Dr. Hansen prescribed a topical cream and indicated that plaintiff had no surgically correctable problem. Dr. Hansen allowed plaintiff to continue working at the giblet packing job. Plaintiff received no further treatment from Drs. Hansen, Bragg, or Doss after this date.
13. At no time during their treatment of plaintiff did Drs. Hansen, Bragg, or Doss remove plaintiff from the giblet packing job. Furthermore, none of these physicians in any way relate plaintiff's shoulder problems or myofascial pain to her job at Defendant.
14. Plaintiff voluntarily removed herself from work on 4 June 1996. On that date plaintiff went out of work on sick leave and received sick leave benefits from an employer-funded, non-contributory plan for six months. The sick leave was granted based on plaintiff's diabetes and high blood pressure, and not because of any shoulder problems. After six months on leave of absence, plaintiff voluntarily resigned from her position defendant.
15. On 5 August 1996, plaintiff was examined by Dr. Robert Lane for a disability evaluation in conjunction with her application for social security disability benefits. Plaintiff's chief complaint was of hypertension, diabetes, bilateral carpal tunnel syndrome, and pain in the legs, hands, and shoulders. Plaintiff related her job history with defendant and that she had quit her job due to back pain and pain radiating to the right leg in 1995. Dr. Lane examined plaintiff and diagnosed back pain, hypertension, uncontrolled diabetes, hypercholesterolemia, bilateral carpal tunnel syndrome release, and right shoulder bursitis. He found no impairment in plaintiff's ability to sit, stand, move about, lift, carry, and handle pain. Dr. Lane does not attribute plaintiff's shoulder problems to her work for defendant.
16. Plaintiff next received medical treatment from Dr. J. Ross Shuping, a neurologist, on 22 April 1997. At this first examination, Dr. Shuping evaluated plaintiff for numbness and pain in her feet and directed treatment for polyneuropathies in plaintiff's lower extremities. Dr. Shuping ultimately performed EMG nerve testing and determined that plaintiff's polyneuropathies were the result of her diabetes. Dr. Shuping ultimately recommended plaintiff undergo a lumbar myelogram with Dr. Hardy, but plaintiff refused so Dr. Shuping provided no further treatment to plaintiff subsequent to 17 February 1998.
17. During his treatment of plaintiff through 17 February 1998, Dr. Shuping did not treat plaintiff for any right shoulder problems. As a result, he did not diagnose her with shoulder bursitis or any form of shoulder impingement and offers no cause for these conditions.
18. On 27 October 1999, plaintiff attended an independent medical evaluation with a physician of her choice, Dr. Dennis Darcey, an occupational medicine physician. Plaintiff's main complaints were of back pain, numbness and weakness in her hands and feet, bilateral foot pain, forgetfulness, fatigue, and insomnia. Dr. Darcey reviewed plaintiff's prior medical records as well as the stipulated job videotape and the ergonomic evaluation by Alan Gorrod, ergonomist. Dr. Darcey examined plaintiff and diagnosed her with a number of conditions, including right rotator cuff tendinitis and right shoulder bursitis. Dr. Darcey's report concludes that having considered plaintiff's medical history regarding her shoulder problems and the videotape of plaintiff's job produced by Alan Gorrod, ergonomist, plaintiff's job would not have predisposed her to develop bursitis or shoulder impingement or rotator cuff tendonitis. Plaintiff's job did not require any overhead, awkward or forceful movements of the shoulder, and there was very little reaching required to retrieve chicken parts.
19. Dr. Darcey's testimony is consistent with the opinions expressed in his report. Dr. Darcey opined that plaintiff's job was not one that would predispose her to develop rotator cuff tendonitis or bursitis of the shoulder. Dr. Darcey also testified that the job did not increase the risk of plaintiff developing those conditions. In response to whether this type of job would aggravate a pre-existing shoulder problem, his answer was "maybe." Dr. Darcey did opine that the job could have caused or increased the risk of aggravating the symptoms of bursitis, however, he offered no testimony that the job actually contributed to any development of the disease.
20. Dr. Darcey's testimony is insufficient to establish that plaintiff's job placed her at an increased risk of aggravating plaintiff's bursitis since Dr. Darcey never offered this opinion as compared to the general public no so employed. Dr. Darcey elaborated on this opinion by stating that any movement of the shoulder would aggravate the pain and inflammation of bursitis. Finally, Dr. Darcey found no connection between plaintiff's shoulder problems and her myofascial pain syndrome.
21. On 27 August 1999, ergonomist Al Gorrod evaluated the giblet packing job at defendant's plant that plaintiff had performed. Mr. Gorrod was a hospital based occupational therapist for a number of years and has been in private practice in the field of ergonomics for twelve to thirteen years. He has also completed a voluntary certification as a specialist in ergonomic evaluation. Since the 1980's, Mr. Gorrod has been licensed by the State of North Carolina as an occupational therapist.
22. Mr. Gorrod performed the evaluation of plaintiff's job by observing it at the plant for an hour and a half and by viewing the stipulated job videotape. In evaluating the job, Mr. Gorrod utilized the ergonomic risk factors identified by the National Institute of Occupational Safety and Health. In so doing, Mr. Gorrod found that in assessing the repetitiveness of the job, both hands are used equally and that on a repetition scale of one to ten, the giblet packing job rates as a five. As far as forceful exertion, the job required no forceful exertion, an observation mirroring that of Dr. Darcey, and thus this factor rated as a zero. With respect to awkward positioning, Mr. Gorrod found that all motion was within twenty-five percent of total range of motion and that body position was well controlled. This factor also rated as zero. Unsupported posture, contract stress, and vibration were not present as ergonomic factors. As far as temperature, Mr. Gorrod found that the ambient temperature in the plant was approximately sixty-five (65) degrees and because it was cool, rated this factor as a one. The pace of the job was rated as moderate.
23. Mr. Gorrod's overall ergonomic risk rating concerning plaintiff's job was a score of one, on a scale of zero to ten. Based on his observations and evaluations of the job, Mr. Gorrod testified that plaintiff's job at the defendant-employer would not place her at an increased risk of developing a cumulative trauma disorder of the upper extremity, and specifically the shoulder, as opposed to members of the general population. Mr. Gorrod's testimony concerning the actual ergonomic evaluation of the job is accepted as credible; however, the undersigned assigns no weight to his opinions regarding increased risk for development of cumulative trauma disorders because he is not duly qualified to render a medical opinion.
24. At the request of Dr. Darcey, the stipulated job videotape was also evaluated by Sabrina Lamar, a licensed physical therapist. Ms. Lamar worked as a physical therapist at Duke University from August 1993 through November 1997. In September 1996, she began sharing duties as a physical therapist and ergonomist. Ms. Lamar has not yet received certification as an ergonomist.
25. In evaluating the giblet packing job, Ms. Lamar applied the strain index. Unlike Mr. Gorrod, Ms. Lamar never actually viewed the job and has not been at a poultry plant to observe the job being performed. Despite a significant amount of time spent discussing the strain index, Ms. Lamar agreed that the index is only applicable to evaluating distal
upper extremities of the elbow, wrist, and hand. This particular index is not designed to evaluate shoulder problems, which is the issue in the case. Dr. Darcey agreed that the strain index only evaluates distal upper extremity problems and not shoulder problems.
26. According to Ms. Lamar, in performing the giblet packing job, the posture of the shoulder was below shoulder height and above waist height, which would generally equate to a safe working posture. Furthermore, Ms. Lamar expressed an opinion that the job would not predispose someone to developing a disorder of the proximal upper extremity [or shoulder]. Ms. Lamar offered the opinion that plaintiff's job could aggravate the symptoms of bursitis.
27. The Full Commission gives no weight to the opinions expressed by Ms. Lamar in that Ms. Lamar is not qualified to render such a medical opinion. Greater weight is assigned to the ergonomic opinion expressed by Mr. Gorrod, considering his greater degree of certification, experience, and knowledge in the field of ergonomics and due to his actual viewing of the job within the premises of defendant's plant.
28. Defendant's OSHA 200 logs for the period from 1994 through May 1999 were admitted into evidence at the hearing. These records show that of the thirty-one (31) total entries for the giblet packing department, only one, the present claim, involves a reported cumulative trauma problem with the shoulder.
29. Since plaintiff's voluntary resignation from her employment with defendant on 4 June 1996, she has not worked at any other job, nor has she sought any other employment. Furthermore, plaintiff has failed to establish that her presumed disability and inability to continue to earn wages was due to causes and conditions characteristic of and peculiar to her employment as a giblet packer with the defendant.
30. The most competent medical evidence in the record fails to establish that plaintiff's employment with the defendant caused or significantly aggravated her right shoulder bursitis. Furthermore, the most competent medical evidence in the record fails to establish that plaintiff's employment in the giblet packing job placed plaintiff at an increased risk of developing or aggravating her right shoulder bursitis, as compared to the general public.
 ***********
Based on upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff has no disease and no disability related to causes and conditions which were characteristic of and peculiar to her employment with defendant-employer. G.S. § 97-53(13).
2. Plaintiff is, therefore, entitled to no compensation under the provisions of the North Carolina Workers' Compensation Act. Id.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commission and enters the following:
 ORDER
1. Under the law, plaintiff's claim is not compensable under the North Carolina Workers' Compensation Act and therefore the same must be and is hereby DENIED.
2. It is ORDERED that an expert witness fee be paid to Dr. J. Th. Bloem in the amount of $235.00, and an expert witness fee be paid to Dr. Dennis Darcey in the amount of $180.00.
3. Each side shall bear its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER